IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JOSEPH DANIEL ROMERO,

      Plaintiff,

v.                                                Civ. No. 12-578 GBW

MICHAEL J. ASTRUE,
*Commissioner of the*
*Social Security Administration*,

      Defendant.

## ORDER GRANTING PLAINTIFF'S MOTION TO REVERSE AND REMAND

      This matter comes before the Court on Plaintiff's Motion to Reverse and Remand the Social Security Administration (SSA) Commissioner's decision to deny Plaintiff disability insurance benefits. *Doc. 17*. For the reasons discussed below, the Court grants Plaintiff's motion and remands this action to the Commissioner for further proceedings consistent with this opinion.

## I.    BACKGROUND

### A.  **Plaintiff's medical history**

      Plaintiff Joseph D. Romero is a 35-year-old married father of two children. His relevant medical history begins in 2006 when he began seeing Stephan J. Chimoskey, M.D., a general practitioner at the Presbyterian Medical Center. The Administrative Record ("AR") indicates that Plaintiff saw Dr. Chimoskey from April 2006 to March 2007. AR at 225-29. During that time, Dr. Chimoskey determined that Plaintiff was

morbidly obese and suffered from insomnia, fatigue, obstructive sleep apnea, and depression.  *Id*.

Dr. Chimoskey referred Plaintiff to Bettina V. Pangan, a certified family nurse practitioner (CFNP), at the Kaseman-Presbyterian Sleep Disorders Center for an evaluation.  *Id*. at 370.   In October 2006, Ms. Pangan met with Plaintiff and diagnosed obstructive sleep apnea syndrome, morbid obesity, and depression.  *Id*. at 372.  Plaintiff underwent a split nocturnal polysomnogram which confirmed the diagnosis of obstructive sleep apnea.  *Id*. at 368-69.  It appears that around this time, Plaintiff began using a Continuous Positive Airway Pressure (CPAP) machine to treat his sleep apnea.  *Id*. at 364, 366-67, 383-409.

Plaintiff began seeing psychiatrist Steven I. Sacks, M.D., in March 2007.  *Id*. at 253.  Dr. Sacks diagnosed Plaintiff with major depression and, beginning in May 2007, met with Plaintiff every two weeks until November 2008.  *Id*. at 253-54.

In 2009, Plaintiff sought another psychiatrist.  *Id*. at 322.  He began seeing Jeanne Corns, a nurse practitioner at the Presbyterian Medical Group, in March 2009.  *Id*.  Ms. Corns diagnosed Plaintiff with depression not otherwise specified, cannabis dependency, and sleep apnea, and noted that his obesity contributed to these conditions.  *Id*. at 293, 326.

In April 2009, Ms. Corns referred Plaintiff to Robert Bechner, MA, a limited licensed professional counselor (LLPC), for a psychiatric diagnostic interview

examination.  *Id*. at 238.  Mr. Bechner found that Plaintiff exhibited symptoms of

depression and made a differential diagnosis of mood disorder, not otherwise specified,

and bipolar disorder, not otherwise specified.  *Id*. at 240.  He also found that Plaintiff

suffered from cannabis dependency, obesity, and sleep apnea.  *Id*.  It is unclear from the

record whether Plaintiff continued to see Mr. Bechner after this initial examination.

     Ms. Corns continued to see Plaintiff monthly through February 2011.  *Id*. at 439.

By June 2009, she noted "mild improvement," *id*. at 308, and in August 2009 she said

that Plaintiff had stopped using cannabis, *id*.  at 305.  On January 5, 2010, in a letter

regarding Plaintiff's non-payment of child support, she said that Plaintiff "is being

treated for a mood disorder that causes him to have poor concentration [and] paranoid

thoughts and anger outbursts. . . . [H]e has started to improve, but he is still a long way

off from being able to work."  *Id*. at 353.  In March 2010, Ms. Corns diagnosed Plaintiff

with bipolar affective disorder, *id*. at 425, but in November 2010, she found that Plaintiff

had improved and altered the diagnosis to mood disorder, not otherwise specified, *id*.

at 448.  She found that Plaintiff also had symptoms of ADHD inattentiveness.  *Id*.  Ms.

Corns' February 2011 records—the last of her records in the administrative record—list

Plaintiff's sole diagnosis as mood disorder, not otherwise specified.  *Id*. at 442.

     In September 2009, Plaintiff met with Leisha A. Bevoni, a certified physician's

assistant (PA-C) and certified diabetes educator (CDE) at Southwest Endocrinology

Associates, for evaluation and management of his obesity.  *Id*. at 335.  Plaintiff was

approved to begin a pre-bariatric surgery weight management program, *id*.at 337, and began seeing Ms. Bevoni monthly, *id*. at 330-46, 410-17, 431-38.  By August 2010, Plaintiff had lost a total of 95 pounds.  *Id*. at 431.  It is unclear from the record whether Plaintiff continued to see Ms. Bevoni after August 2010.

### B.  Procedural history

Plaintiff applied for disability insurance benefits and supplemental security income on June 15, 2009, alleging that his obesity and depression prevented him from working.  *Id*. at 10, 154, 158.  On August 17, 2009, Plaintiff underwent a disability determination examination conducted by Harry Burger, D.O.  *Id*. at 256.  Dr. Burger found that Plaintiff was morbidly obese but "intent on pursuing correction of same through surgical weight loss surgery."  *Id*. at 258.  He noted that Plaintiff "shows no real signs of major depression" and "has normal ranges of motion," but "[h]e most probably does have back pain and strain and knee and foot disorders."  *Id*. at 258-59.  Dr. Burger concluded that Plaintiff "most probably is limited . . . in regards to standing and more active activity.  He most probably is not limited in sitting occupations . . . ."  *Id*. at 259.

On August 26, 2009, Scott R. Walker, M.D., conducted a psychiatric examination on behalf of the SSA and found that Plaintiff suffers from "nonsevere" depression.  *Id*. at 264, 267, 276.  He concluded that Plaintiff had mild difficulties in maintaining social functioning, but no problems with regards to daily activities, concentration, or decompensation.  *Id*. at 274.

4

The following day, August 27, 2009, Janice Kando, M.D., conducted a Physical Residual Functional Capacity Assessment of Plaintiff. *Id*. at 278. She found that Plaintiff could lift up to 10 pounds frequently and 20 pounds occasionally, stand/walk 2-6 hours in an 8 hour workday, and sit about 6 hours in an 8 hour workday, but could not climb ladders, ropes, or scaffolds. *Id*. at 279-80. She found no limitations on Plaintiff's ability to push or pull, *id*. at 279, but determined that Plaintiff should avoid concentrated exposure to hazards, *id*. at 282.

That same day, August 27, 2009, the SSA denied Plaintiff's application for disability benefits. *Id*. at 60. On September 30, 2009, Plaintiff requested reconsideration of that determination. *Id*. at 70. In March 2010, N.D. Nickerson, M.D., and Elizabeth Chiang, M.D., examined Plaintiff's case as part of the SSA's reconsideration process. *Id*. at 347-48. Both affirmed the initial August 27, 2009, residual functional capacity determination by Dr. Kando. *Id*. Dr. Chiang specifically noted that as of March 2010 Ms. Corns had diagnosed Plaintiff with "Depressive Disorder NOS [not otherwise specified], Cannabis Dependence, and Mood Disorder NOS." *Id*. at 348. She nevertheless determined that Plaintiff "remain[s] capable of work." *Id*. On March 24, 2010, the SSA upheld its initial denial of benefits. *Id*. at 71.

On April 15, 2010, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). *Id*. at 78. The hearing was held on February 16, 2011, before ALJ Ben Willner. *Id*. at 24. On May 10, 2011, the ALJ issued his decision finding that Plaintiff is

5

not disabled and therefore not entitled to disability benefits or supplemental security income, *id.* at 19.  In making that decision, the ALJ applied the required sequential analysis.  *Id.* at 11-12.  He first determined that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of May 1, 2009.  *Id.* at 12.  Next, at step two, he found that Plaintiff suffered from four severe impairments: obesity, mild degenerative disc disease of the left knee, affective disorder, and sleep apnea.  *Id.* At step three, he concluded that Plaintiff does not suffer from a listed impairment.  *Id.* Then, at step four, he determined that Plaintiff has a residual functional capacity (RFC) to perform light work with the following limitations: Plaintiff cannot frequently climb, balance, stoop, kneel, or crawl; he cannot be exposed to hazards; and he must work primarily with things rather than people.  *Id.* at 14.  In light of this RFC, the ALJ found that Plaintiff is unable to return to his past relevant work as a cook, customer service representative, or sales representative.  *Id.* at 17.  However, at step five, the ALJ found, after consultation with a vocational expert, that Plaintiff is not disabled because "there are jobs that exist in significant numbers in the national economy that the claimant can perform."  *Id.* at 18.  In particular, the ALJ relied on the vocational expert's testimony to find that Plaintiff could work as a final assembler, laminator, or order clerk.  *Id.*

On June 2011, Plaintiff requested review of the ALJ's decision.  *Id.* at 127.  The SSA Appeals Council denied that request on April 16, 2012.  *Id.* at 1.  Plaintiff filed the

instant action on May 29, 2012, seeking reversal and remand of the Commissioner's

denial of benefits.  *Doc. 1.*

## II.   APPLICABLE LAW

### A.  Standard of review

Pursuant to 42 U.S.C. § 405(g), a court may review a final decision of the

Commissioner only to determine whether it (1) is supported by "substantial evidence,"

and (2) comports with the proper legal standards.  *Casias v. Sec'y of Health & Human*

*Serv.*, 933 F.2d 799, 800-01 (10th Cir. 1991).  "In reviewing the ALJ's decision, 'we neither

reweigh the evidence nor substitute our judgment for that of the agency.'"  *Bowman v.*

*Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008).

Substantial evidence is "more than a mere scintilla. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."

*Casias*, 933 F.3d at 800.  "The record must demonstrate that the ALJ considered all of the

evidence, but an ALJ is not required to discuss every piece of evidence."  *Clifton v.*

*Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).  "[I]n addition to discussing the evidence

supporting his decision, the ALJ must also discuss the uncontroverted evidence he

chooses not to rely upon, as well as significantly probative evidence he rejects."  *Id*. at

1010.  "The possibility of drawing two inconsistent conclusions from the evidence does

not prevent [the] findings from being supported by substantial evidence." *Lax v. Astrue*,

489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

### B. Disability determination process

For purposes of Social Security disability insurance benefits, an individual is disabled when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a person satisfies these criteria, the SSA has developed a five step test. *See* 20 C.F.R. § 404.1520. If the Commissioner is able to determine whether an individual is disabled at one step, he does not go on to the next step. *Id*. § 404.1520(a)(4). The steps are as follows:

(1) Claimant must establish that he is not currently engaged in "substantial gainful activity." If claimant is so engaged, he is not disabled.
(2) Claimant must establish that he has "a severe medically determinable physical or mental impairment . . . or combination of impairments" that have lasted for at least one year. If claimant is not so impaired, he is not disabled.
(3) Claimant must establish that his impairment(s) are equivalent to a listed impairment that has already been determined to be so severe as to preclude substantial gainful activity. If listed, the impairment(s) are presumed disabling.
(4) If the claimant's impairment(s) are not listed, claimant must establish that the impairment(s) prevent him from doing his "past relevant work." If claimant is capable of returning to his past relevant work, he is not disabled.
(5) If claimant establishes that the impairment(s) prevent him from doing his past relevant work, the burden shifts to the Commissioner to show that claimant is able to "make an adjustment to other work." If the Commissioner is unable to make that showing, claimant is deemed disabled.

*See* 20 C.F.R. § 1520(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005).

The primary issue in this case is the fourth step of the five step evaluation process. Step four of the analysis consists of three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ determines the claimant's residual functional capacity in light of "all of the relevant medical and other evidence." 20 C.F.R. § 404.1545(a)(3). A claimant's RFC is "the most [he] can still do despite [his physical and mental] limitations." *Id*. § 404.1545(a)(1). Second, the ALJ determines the physical and mental demands of claimant's past work. "To make the necessary findings, the ALJ must obtain adequate 'factual information about those work demands which have a bearing on the medically established limitations.'" *Winfrey*, 92 F.3d at 1024 (quoting Social Security Ruling 82-62 (1982)). Third, the ALJ determines whether, in light of his RFC, the claimant is capable of meeting those demands. *Id*. at 1023, 1025.

## III.   ANALYSIS

Plaintiff does not challenge the ALJ's determinations at steps one, two, and three of the sequential analysis. The dispute centers on the ALJ's determination of Plaintiff's RFC at step four and his finding at step five that there are a significant number of jobs in the national economy that Plaintiff is capable of performing. Specifically, Plaintiff argues that the ALJ's findings are erroneous for three reasons: (1) the ALJ failed to properly consider Plaintiff's obesity when determining his RFC; (2) the ALJ's RFC finding is not supported by substantial evidence; and (3) the ALJ incorrectly determined that Plaintiff could work as an order clerk. The Court reverses and remands the ALJ's

RFC determination and his finding that Plaintiff can work as an order clerk.  The Court

affirms the ALJ's consideration of Plaintiff's obesity and his evaluation of the record as

a whole as well as of Mr. Bechner, Ms. Corns, and Dr. Sacks' opinions.

### A.  The ALJ properly considered Plaintiff's obesity.

Plaintiff argues that the ALJ failed to properly consider the effects of his obesity

on his RFC because the ALJ did not make a "function-by-function assessment" and

merely recited boilerplate language in his discussion of obesity.  *Doc. 17* at 8-9.  Social

Security Ruling (SSR) 02-1p "requires an ALJ to consider the effects of obesity when

assessing RFC, including the fact that 'the combined effects of obesity with other

impairments can be greater than the effects of each of the impairments considered

separately.'"  *DeWitt v. Astrue*, 381 F. App'x 782, 785 (10th Cir. 2010) (*quoting* SSR 02-1p

(2002)).

While the ALJ's consideration of Plaintiff's obesity could certainly have been

more thorough, it is sufficient under SSR 02-1p.  Contrary to Plaintiff's contention, the

Tenth Circuit does not require a function-by-function analysis of the effect of obesity on

a claimant's impairments and has repeatedly upheld broad statements and conclusory

analysis.  *See, e.g., Camp v. Barnhart*, 103 F. App'x 352, 354 (10th Cir. 2004) (affirming

RFC determination when ALJ stated only that the medical evidence showed that

Plaintiff's "weight would not prevent [him] from performing light work with the

limitations listed"); *Fagan v. Astrue*, 231 F. App'x 835, 838-39 (10th Cir. 2007) (affirming

the ALJ's RFC determination even though "the ALJ did not reference SSR 02-1p or explicitly examine the impact of Ms. Fagan's obesity on each of her . . . impairments"); *Arles v. Astrue*, 438 F. App'x 735, 740 (10th Cir. 2011) (affirming the ALJ's consideration of obesity when he stated only that he "examined the medical records and found 'no evidence of an inability to ambulate effectively or an inability to perform fine and gross movements effectively'").

 Here, after a lengthy paragraph of admittedly standard language describing the factors an ALJ must take into account when considering a claimant's obesity, the ALJ stated that he had "considered the effects of the claimant's obesity and included those effects within the determination of the claimant's residual functional capacity."  AR at 13.  In his step four analysis, the ALJ considered Plaintiff's testimony about his daily activities and concluded that "[i]n terms of the claimant's allegations relating to established impairments such as *obesity*, sleep apnea, [and] back and knee pain[,] the claimant continues to engage in various activities that in my opinion demonstrates [sic] that he is capable of work activity at some level . . . ."  *Id*. at 15 (emphasis added).  The ALJ also discussed at length the opinions of Mr. Bechner, Ms. Corns, and Dr. Burger.  *Id*. at 16-17.  Each of these individuals considered Plaintiff's obesity when formulating their opinions regarding Plaintiff's mental and physical limitations.  *See, e.g.*, AR at 238-41, 246, 256-59, 293.  Thus, in discussing their findings regarding Plaintiff's capabilities and limitations, the ALJ necessarily took into account the ramifications of Plaintiff's obesity.

11

*See Howard v. Barnhart*, 379 F.3d 945, 948 (10th Cir. 2004) (holding ALJ sufficiently discussed plaintiff's obesity when he addressed the physical limitations caused by it rather than the obesity itself).

Plaintiff relies upon *Dewitt v. Astrue*, 381 F. App'x 782 (10th Cir. 2010), to argue that the ALJ's consideration of Plaintiff's obesity was insufficient.  In that case, the ALJ relied heavily on a consultant's opinion in assessing the effects of plaintiff's obesity despite the fact that the consultant never addressed plaintiff's obesity.  *Dewitt*, 381 F. App'x at 785.  The Tenth Circuit reversed because, discounting the consultant's opinion, there was no other indication that the ALJ had considered the effects of the plaintiff's obesity.  *Id*. at 785-86.  *Dewitt* is inapposite because, in the instant action, the ALJ relied on Plaintiff's testimony and the aforementioned medical opinions, all of which expressly discussed Plaintiff's obesity.  *See Prince v. Astrue*, slip op., 2012 WL 2370056, at *12 (N.D. Okla. June 22, 2012) ("*DeWitt* is distinguishable from the present case, because [the ALJ considered the opinion of] Dr. Shires[, who] was aware of Prince's weight and morbid obesity, and with that awareness nevertheless found that Prince could perform medium work.").

Lastly, Plaintiff cites to no evidence demonstrating that his obesity limits his abilities beyond the restrictions already imposed by the ALJ.  *See Fagan*, 231 F. App'x at 838-39 (finding ALJ properly considered plaintiff's obesity when plaintiff, who has burden at steps three and four of the disability analysis, failed to show additional

limiting effect of obesity); *Arles*, 438 F. App'x at 740 (same).  Nor does he identify evidence overlooked by the ALJ.  In fact, the only specific evidence cited by Plaintiff to support his contention that the ALJ failed to fully consider his obesity is his own testimony regarding his fatigue and lack of concentration and the difficulty he has putting on shoes and using the restroom.  *Doc. 17* at 8.  The ALJ discussed Plaintiff's testimony and expressly stated that he considered Plaintiff's subjective complaints when determining Plaintiff's RFC "in terms of [Plaintiff's] allegations relating to established impairments such as obesity . . . ."  AR at 15.  It is this Court's "general practice . . . to take a lower tribunal at its word when it declares that it has considered a matter."  *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005).  For these reasons, the Court finds that the ALJ adequately considered Plaintiff's obesity.

**B.  <u>The ALJ properly evaluated the opinions of Mr. Bechner, Ms. Corns, and Dr. Sacks and the record as a whole but his RFC determination is not supported by substantial evidence.</u>**

Plaintiff next argues that the ALJ's decision is not supported by substantial evidence.  AR at 9.  The Court understands this section of Plaintiff's motion to make four separate arguments: (1) the ALJ improperly evaluated the opinions of Mr. Bechner and Ms. Corns; (2) the ALJ failed to consider the entire record; (3) the ALJ should not have considered the opinion of Dr. Sacks; and (4) the ALJ's RFC determination is not supported by substantial evidence.  *See doc. 17* at 9-13.  The Court will consider each argument individually.

### 1. *The ALJ properly evaluated the opinions of Mr. Bechner and Ms. Corns.*

Plaintiff first argues that the ALJ improperly discounted the opinions of Mr. Bechner and Ms. Corns. *Doc. 17* at 9. To determine whether a claimant has a disabling impairment, the SSA requires evidence from "acceptable medical sources." 20 C.F.R. §§ 404.1513(a) (disability benefits), 416.913(a) (supplemental security income). Acceptable medical sources are licensed medical and osteopathic physicians, licensed psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. *Id*. When considering how much weight to give the opinion of an acceptable medical source, the SSA looks to factors such as whether the source has examined the claimant, the nature and length of the treatment relationship, whether the opinion is supported by evidence, whether the opinion is consistent with the record as a whole, and whether the source is opining on issues within his area of specialty. *Id*. §§ 404.1527(c), 416.927(c).

The SSA may also consider evidence from other medical sources who do not qualify as acceptable medical sources, such as nurse practitioners and therapists. *Id*. §§ 404.1513(d)(1), 416.913(d)(1). Although the regulations do not explain how to weigh the opinions of these other sources, SSR 06-3p advises that they should be evaluated in light of the same factors applicable to the opinions of acceptable medical sources. SSR 06-3p (2006). While "[t]he fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight[,] . . . . depending on the

particular facts in a case, and after applying the factors for weighing opinion evidence,

an opinion from a medical source who is not an 'acceptable medical source' may

outweigh the opinion of an 'acceptable medical source' . . . ."  *Id*.  An ALJ "should

explain the weight given to opinions from these 'other sources,' or otherwise ensure

that the discussion of the evidence in the determination or decision allows a claimant or

subsequent reviewer to follow the adjudicator's reasoning . . . ."  *Id*.  However, an ALJ is

not required to expressly apply each of the relevant factors listed in § 404.1527(d) and §

416.927(d) when evaluating medical opinions.  *Oldham v. Astrue*, 509 F.3d 1254, 1258

(10th Cir. 2007).

As the ALJ pointed out, neither Mr. Bechner, a licensed professional clinical

counselor, nor Ms. Corns, a nurse practitioner, are "acceptable medical sources."  *See* 20

C.F.R. § 404.1513(d)(1), 416.913(d)(1) (listing nurse practitioners and therapists as "other

sources"); *Moraga v. Barnhart*, Civ. No. 02-1407, at 13-14 (D.N.M. Mar. 3, 2004) (doc. 19)

(finding an LLPC is not an "acceptable medical source").  The ALJ explained that he

"considered their opinions but d[id] not accord great weight" to them, noting that

neither opinion is supported by an accompanying opinion from an acceptable medical

source and that Ms. Corns' opinion that Plaintiff is "still a long way off from being able

to work" is inconsistent with the record.  AR at 16-17.

Plaintiff is particularly troubled by the ALJ's decision to discount Ms. Corns'

opinion given her ongoing relationship with Plaintiff since 2009.[1]  *Doc. 17* at 11.

However, the ALJ is required only to give "good reasons" for the weight given to her

opinion.  *Oldham*, 509 F.3d at 1258.  The ALJ considered the length of Ms. Corn's

treating relationship with Plaintiff, but found that it was outweighed by the

inconsistencies between her opinion and the remainder of the record.  AR at 16.  Indeed,

Ms. Corns is the only source who opined that Plaintiff is unable to work.  *See id*. at 353.

As the ALJ discussed, Dr. Sacks found that Plaintiff had improved during the year that

he treated Plaintiff, *id*. at 17, 253-54; Ms. Bevoni noted that Plaintiff lost over 100 pounds

while working with Southwest Endocrinology Associates, *id*. at 17, 410; and Drs.

Burger, Kando, Nickerson, and Chiang all found Plaintiff capable of at least sedentary

work, *id*. at 17, 259, 278-85, 347-48.  The ALJ also indicates that Ms. Corns herself found

that Plaintiff has made "some improvement" and that "presently [his] symptoms are

controlled."  *See id*. at 16, 444, 446, 448.  Therefore, the ALJ's decision adequately

explains his reasons for discounting Mr. Bechner and Ms. Corns' opinions.[2]

---

[1] While Plaintiff discusses the portions of Ms. Corns' records that he believes the ALJ improperly overlooked, *doc. 17* at 11, he points to no similar portions of Mr. Bechner's opinion.

[2] Although the ALJ did not mention it, the Court also notes that Ms. Corns' opinion that Plaintiff "is still a long way from being able to work" is not a medical opinion since it addresses an issue reserved to the Commissioner. It is therefore entitled no deference.  *See* 20 C.F.R. § 404.1527(d)(3), 416.927(d)(3); *Balthrop v. Barnhart*, 116 F. App'x 929, 932 (10th Cir. 2004).

### 2. *The ALJ properly considered the record when determining Plaintiff's RFC.*

Plaintiff next argues that the ALJ failed to consider some, and improperly considered other, parts of the evidence in the administrative record. *Doc. 17* at 11.  In particular, he contends that the ALJ erred when he referenced only a portion of Ms. Corns' records from Presbyterian Behavioral Health in his decision and failed to discuss the more recent records dating from March 2009 to February 2011 (exhibits 9F, 18F, and 20F).  However, there is no evidence that the ALJ failed to consider all of the Presbyterian records.  While it is true that he cited only to a few specific exhibits, "an ALJ is not required to discuss every piece of evidence."  *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).  He must only "discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Id*. at 1010.  The ALJ complied with these requirements: as discussed above, he explained why he chose not to rely on Ms. Corns' opinion.  AR at 16-17.   He also explained that Ms. Corns' opinion was, in fact, controverted by the other evidence in the record.  *Id*.  The ALJ had no duty to cite every exhibit in the record as part of that discussion.

Moreover, Plaintiff does not explain how exhibits 9F, 18F, and 20F in particular would have altered or enhanced the ALJ's discussion.  These exhibits indicate that Ms. Corns diagnosed Plaintiff with a mood disorder not otherwise specified and cannabis dependency and that Plaintiff also had issues with anger and anxiety.  *See, e.g., id*. at 293, 297-312, 326, 422-29,441-51.  They also discuss his mood, symptoms, and

17

medications.  *See, e.g., id*.  Therefore, unlike Ms. Corns' ultimate opinion that Plaintiff is

unable to work, they are in line with the other evidence in the record.  *See, e.g*., AR at

240 (Mr. Bechner's diagnosis of depression and cannabis dependence), 253-54 (Dr.

Sacks' discussion of depression and anger issues); 267, 274 (Dr. Walker's diagnosis of

depression and difficulty maintaining social functioning); 348 (Dr. Chiang's analysis

noting depression, cannabis dependence, and anger issues).  There is no indication that

the ALJ did not rely on Ms. Corns' progress notes, along with this other evidence, when

determining Plaintiff's RFC.

Plaintiff also argues that the ALJ improperly "raised the issue of [Plaintiff's]

medical improvement," citing 20 C.F.R. § 404.1594.  *Doc. 17* at 12.  That regulation deals

with the continuation and termination of disability benefits after a claimant begins

receiving them.  20 C.F.R. § 404.1594(a).  The regulation is therefore inapposite to the

instant case, which involves the determination of whether a claimant is entitled to

benefits in the first place.

Finally, Plaintiff claims that the ALJ relied on Plaintiff's medical improvement

when determining his RFC "but fail[ed] to identify [supporting] evidence or

mischaracterized the evidence he did discuss."  *Doc. 17* at 11-12.  Plaintiff makes this

one-sentence allegation in passing and offers no examples of the ALJ's

mischaracterization of evidence.  In fact, the ALJ cited numerous exhibits indicating

improvement: he noted that Ms. Corns' records indicate that Plaintiff has improved and

"presently [Plaintiff's] symptoms are controlled," that Plaintiff lost over 100 pounds while working with Southwest Endocrinology, and that Dr. Sacks noticed improvement in Plaintiff's functioning. AR at 16-17.  Given that these are the three individuals who saw Plaintiff regularly over a period of months or years, the ALJ's reliance on their findings of improvement is entirely reasonable.

### 3.   *The ALJ properly considered Dr. Sacks' opinion.*

Plaintiff next argues that it was "legal error for the ALJ to use Dr. Sacks' opinion to support a finding of medical improvement, since Dr. Sacks treated Mr. Romero from March 2007 to November 2008, and the claimant's alleged onset date is May 2009."  *Doc. 17* at 12.  Plaintiff cites no law to support this assertion of "legal error" and, in fact, Tenth Circuit case law says the opposite—an ALJ not only can, but should, consider medical opinions predating the alleged onset date.  "[E]ven if a doctor's medical observations regarding a claimant's allegations of disability date from earlier, previously adjudicated periods, the doctor's observations are nevertheless relevant to the claimant's medical history and should be considered by the ALJ."  *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004); *see also Lackey v. Barnhart*, 127 F. App'x 455, 458 (10th Cir. 2005) (extending *Hamlin* to records predating onset date in the absence of prior disability adjudication).  This is particularly true when the evidence regards an impairment that began prior to the alleged onset date but continued after it. *Lackey*, 127 F. App'x at 458.

Here, the ALJ had every reason to consider Dr. Sacks' opinion.  Dr. Sacks was

one of the few physicians to treat Plaintiff over an extended period of time.  He treated

Plaintiff for mental health issues, including depression, which continued long after

Plaintiff's alleged onset date.  *See* AR at 296-309, 353, 422-27, 442-52 (Ms. Corns' records

from May 2009 to February 2011 discussing Plaintiff's depression and other mental

health concerns).  His opinion therefore provides a baseline against which to compare

later evidence. *See Lackey*, 127 F. App'x at 458-59.  Moreover, Dr. Sacks' opinion is not so

old as to be non-probative: he last saw Plaintiff in November 2008, only six months

before Plaintiff's alleged onset date in May 2009.  *See Hamlin*, 365 F.3d at 1215-19

(finding medical opinions predating onset date by two to seven years potentially

probative).  Finally, the ALJ did not rely on Dr. Sacks' opinion alone to support his

findings of improvement.  He also discussed the records of Ms. Corns, Dr. Burger, and

Southwest Endocrinology and referred to the opinions of Drs. Walker, Nickerson, and

Chiang, all of which date, at least in part, from after the alleged onset date.  *See* AR at

17.  For these reasons, the ALJ's consideration of Dr. Sacks' opinion was appropriate.

### 4.   *The ALJ's RFC determination is not supported by substantial evidence.*

Plaintiff succeeds on his final claim under the substantial evidence heading.  He

argues that the ALJ erred when he "provided no link between the evidence and the RFC

finding."  *Doc. 17* at 13.  SSR 96-8p requires that the ALJ "describe[e] how the evidence

supports [his] conclusion."  SSR 96-8p (1996).  He must also "explain how any material

inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id*.

Here, the ALJ determined that Plaintiff had a RFC of "light work . . . except for frequent postural limitations in climbing, balancing, stooping, kneeling, crouching, crawling, avoidance of exposure to hazards and working primarily with things rather than people." AR at 14.  According to the SSA regulations,

> [l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing . . . . To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).  "[T]he primary difference between sedentary and most light jobs" is the amount of standing and walking – "the full range of light work requires standing and walking, off and on, for a total of approximately 6 hours of an 8-hour workday."  SSR 83-10 (1983); *see also Talbot v. Heckler*, 814 F.2d 1456, 1463-64 (10th Cir. 1987) (finding that restrictions on a claimant's ability to stand and walk "would seem to impose significant restrictions on the ability to perform light work, since light work by definition is work that requires a 'good deal of walking or standing'").

The ALJ's analysis fails to link his light work RFC determination to evidence in the record.  By finding that Plaintiff is capable of light work, the ALJ necessarily determined that Plaintiff can stand and walk for 6 hours per day.  The evidence in the record appears to indicate otherwise.  Dr. Burger found that Plaintiff "most probably is

limited then in regards to standing and more active activity.  He most probably is not limited in sitting occupations . . . ."  AR at 259.  Dr. Kando, in her Physical Residual Functional Capacity Assessment (which was affirmed by Drs. Nickerson and Chiang), checked the box for "at least 2 hours in an 8-hour workday" rather than the following box for "about 6 hours in an 8-hour workday" when asked how long Plaintiff can stand and/or walk in one day. AR at 279, 347-48.  The ALJ cited no evidence contradicting these findings.  While the ALJ may have been relying on Plaintiff's own testimony about his daily activities when he determined that Plaintiff was capable of light work, "[j]udicial review is limited to the reasons stated in the ALJ's decision."  *Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008).  "[P]ost hoc rational[ization of the ALJ's decision] is improper because it usurps the agency's function of weighing and balancing the evidence in the first instance."  *Id*.  Even if the ALJ were relying on Plaintiff's testimony, he has a duty to explain how he resolved the discrepancy between that evidence and the aforementioned medical evidence.  *See* SSR 96-8p; *Diggdon v. Apfel*, 189 F.3d 477, at *5-*6 (10th Cir. 1999) (remanding when the ALJ failed to resolve inconsistencies between evidence and RFC determination); *Henderson v. Astrue*, slip op., 2013 WL 141610, at *2-*3 (D. Kan. Jan. 11, 2013) (finding the ALJ erred in failing to explain discrepancy between light work RFC determination and medical opinions stating plaintiff unable to stand or walk for prolonged periods of time).

The other postural limitations imposed by the ALJ—no frequent climbing, balancing, stooping, kneeling, and crouching, crawling—and the limitation on exposure to hazards appear to be derived from Dr. Kando's Physical Residual Functional Capacity Assessment.[3]  *See* AR at 280, 282.  However, the ALJ does not cite to Dr. Kando's assessment anywhere in his decision and, although he mentions Plaintiff's range of motion generally, he provides no other support for those specific limitations. Again, this Court cannot rationalize or justify the ALJ's determinations via its own review of the evidence. *Carpenter*, 537 F.3d at 1267.  The ALJ must himself link his RFC limitations to specific evidence in the record and he has failed to do so.

## C.  <u>The ALJ improperly determined that P could work as an order clerk.</u>

If an ALJ determines, as he did here, that the claimant cannot perform his past relevant work,[4] he must next determine whether, in light of his RFC, the claimant is capable of adjusting to any other jobs that exist in significant numbers in the national economy.  20 C.F.R. §§ 404.1520(g), 404.1560(c)(1).  Here, the ALJ relied on the testimony

---

[3] Plaintiff also briefly complains that the ALJ "limited Mr. Romero to working with things rather than people, apparently based on his own psychiatric review technique."  *Doc. 17* at 12.  While the ALJ's discussion of this limitation could have been clearer, the ALJ does cite substantial evidence supporting his conclusion.  For example, he notes that Plaintiff testified that "[h]e does not like talking to others," his wife said that "he becomes frustrated with 'social aspects and relationships and/or communicating with others,'" Ms. Corns found that Plaintiff was limited "in the ability to interact appropriately with general public coworkers," and Dr. Sacks noted the "continuance of anger issues and irritability."  AR at 5-17. The ALJ also discussed Plaintiff's affective disorder at step three of the sequential analysis, relying on Plaintiff's own statements in his Function Report to find that Plaintiff "has moderate difficulties" in "social functioning." AR at 14.  Plaintiff does not challenge this determination.  The ALJ then specifically stated that he would take his findings at step three into account when determining Plaintiff's RFC at step four.  *Id.*

[4] Plaintiff does not challenge this determination.

of the vocational expert (VE) to find that Plaintiff would be capable of performing three

jobs: final assembler, laminator, and order clerk.  AR at 18.

Plaintiff objects to the job of order clerk.  He argues that the ALJ failed to address

the conflict between the duties of an order clerk and Plaintiff's RFC determination

limiting him to "working primarily with things rather than with people."  *Doc. 17* at 13.

Plaintiff goes on to argue that, assuming the job of order clerk is not available to him,

there are not a significant number of final assembler and laminator jobs available in

New Mexico and in the national economy.  *Id*.  Defendant's position on whether the ALJ

adequately addressed Plaintiff's ability to perform the duties of an order clerk in light of

his limitations is ambiguous, but Defendant contends that, regardless, there are

sufficient final assembler and laminator jobs in the national economy.  *Doc*. 18 at 9.

The Court agrees with Plaintiff that the ALJ erred in failing to address the

discrepancy between his order clerk determination and Plaintiff's limitations.  At step

four, the ALJ determined that Plaintiff was limited to "working primarily with things

rather than with people."  AR at 14.  At step five, relying on the VE's testimony, he

found Plaintiff capable of working as an order clerk.  *Id*. at 18.  The primary duty of an

order clerk is to "read[] items listed on order sheets to LABORER, STORES . . . who

gathers and assembles items or to BILLING TYPIST . . . who prepares bills for items."

*Dictionary of Occupational Titles*, 209.667-014, 1991 WL 671807 (4th ed. 1991).  The

Dictionary of Occupational Titles' description of the position also states that an order

clerk must frequently both talk, and listen to, other people.  *Id*.  The ALJ's two findings clearly conflict.

"[T]he ALJ must investigate and elicit a reasonable explanation for any conflict between the Dictionary and expert testimony before the ALJ may rely on the expert's testimony as substantial evidence to support a determination of nondisability." *Haddock v. Apfel*, 196 F.3d 1084, 1091 (10th Cir. 1999); *see also* SSR 00-4p.  This is not to say the ALJ must put aside a VE's testimony when it conflicts with the DOT; it merely means that the ALJ must ask the VE about the conflict and determine whether his explanation is reasonable.  SSR 00-4p; *see also Hackett v. Barnhart*, 395 F.3d 1168, 1175 (10th Cir. 2005).

At the hearing before the ALJ, the ALJ asked the VE whether there are jobs in the national economy that an individual with Plaintiff's limitations could perform.  AR at 52.  He specifically described the individual as "limited to working with things rather than with people."  *Id*.  But when the VE replied that such an individual could perform the work of a final assembler, laminator, or order clerk, *id*. at 53, the ALJ did not ask the VE to explain the apparent discrepancy between the duties of an order clerk and Plaintiff's limitation on working with people.  *See id*. at 53-54.  The ALJ's decision also fails to acknowledge or address this discrepancy.  It merely includes the conclusory statement that "the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles."  *Id*. at 18.  The ALJ therefore failed to investigate and explain the conflict as required by SSR 00-4p.

25

Plaintiff asserts that if one assumes that he is not, in fact, able to perform the duties of an order clerk and is therefore limited to the jobs of final assembler and laminator, there are not a sufficient number of available jobs to satisfy the requirement that the jobs exist in "significant numbers in the national economy." *Doc. 17* at 13; 20 C.F.R. § 404.1560(c)(1).  The VE testified that there are 2.2 million final assembler jobs nationally, 200 of which are in New Mexico, and 2.8 million laminator jobs, 300 of which are in New Mexico.  AR at 18.  Plaintiff argues that 500 available jobs within New Mexico is not a "significant" number.  *Doc. 17* at 13.  Defendant argues that the focus of the inquiry at step five is the availability of jobs in the *national* economy and that 5 million is clearly a significant number.  *Doc. 18* at 9.

While Defendant is correct that the focus of the inquiry is on jobs available in the national economy, the Court will nevertheless remand on this issue because the ALJ did not have the opportunity to determine whether the final assembler and laminator jobs alone exist in significant numbers.  "[T]he issue of numerical significance entails many fact-specific considerations requiring individualized evaluation, and . . . the evaluation 'should ultimately be left to the ALJ's common sense in weighing the statutory language as applied to a particular claimant's factual situation.'"  *Allen v. Barnhart*, 357 F.3d 1140, 1144 (10th Cir. 2004) (quoting *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992)).  A finding of harmless error is inappropriate in this case because 500 is a small enough number of jobs "to put the issue in a gray area requiring the ALJ to

address it."  *See Allen*, 357 F.3d at 1145 (noting that the court in *Trimear* refused to find that 650-900 jobs was a significant number as a matter of law and remanding when only 100 surveillance-monitor jobs were available in the state); *Chavez v. Barnhart*, 126 F. App'x 434, 436 (10th Cir. 2005) (remanding when there were 199 parking attendant jobs in the state and 49,957 nationally).  Remanding on this issue is particularly appropriate given the decision to remand on the RFC determination issue.

**IV.**   <u>CONCLUSION</u>

The Court finds that the ALJ's RFC determination and determination that Plaintiff could work as an order clerk did not comport with proper legal standards and were not supported by substantial evidence.  However, the ALJ's consideration of Plaintiff's obesity and his evaluation of the record and the opinions of Mr. Bechner, Ms. Corns, and Dr. Sacks was adequate.

Therefore, Plaintiff's Motion to Reverse and Remand is GRANTED.  This action is REMANDED to the Commissioner for further proceedings consistent with this opinion.

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
**Presiding by consent**

27